[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 11, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-10372
Non-Argument Calendar

_____

D. C. Docket No. 03-01699-CV-T-26-EAJ

BRIAN A. JERONIMUS,

Plaintiff-Appellant,

versus

POLK COUNTY OPPORTUNITY COUNCIL, INC.,
LOTTIE S. TUCKER,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 11, 2005)

Before CARNES, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Brian A. Jeronimus, a white male, appeals the district court's order granting summary judgment in favor of defendants Polk County Opportunity Council ("PCOC") and Lottie Tucker ("Tucker") on his claims of race and sex discrimination and retaliation in violation of Title VII, the Florida Civil Rights Act ("FCRA"), and 42 U.S.C. § 1981. After review, we affirm.

## I. BACKGROUND

PCOC is a non-profit agency that provides social and economic services to assist low-income families, children, seniors, and persons with disabilities. On February 7, 2000, PCOC hired Jeronimus as its Director of Finance. In this position, Jeronimus was responsible for overseeing all of PCOC's financial matters, including PCOC's administration of the federal Head Start and Community Service Block Grant ("CSBG") programs. Lottie Tucker, PCOC's Executive Director, interviewed and recommended Jeronimus for employment because of his experience in non-profit agency financial management, specifically Head Start funding.[1]

**A.    Jeronimus's Performance Deficiencies**

**1.    Memos Addressing Performance Concerns**

On April 5, 2000, shortly after Jeronimus began his employment, Tucker

---

[1]Head Start is an early childhood education program for three and four year-old children, after which, the children are prepared to begin kindergarten.

expressed concerns about the way in which he interacted with another PCOC employee. In a memo to his personnel file, Tucker recounted her efforts to resolve a conflict between Jeronimus and Elaine Dustin, a woman who was then Jeronimus's accounting supervisor. In her August, 2000 evaluation of Jeronimus, Tucker indicated that Jeronimus met or exceeded expectations in all categories, but noted that he should work on his communication skills.

On March 21, 2001, Tucker sent Jeronimus a memo expressing her concerns over several financial matters. Specifically, Tucker noted a transfer of agency funds between unrelated accounts, the failure to report to her the existence of a cash flow problem, the failure to complete correctly a line of credit application, and the delegation of research work to PCOC's outside accounting firm. Tucker ended the letter emphasizing that "[t]hese are serious concerns, which need to be handled expeditiously."

In a May 16, 2001 memo to Jeronimus, Tucker expressed her concerns over his management of staff members. Specifically, she addressed an instance of intimidation by Jeronimus toward his staff members after they complained about him and the delegation of tasks that he should be handling. Tucker also noted that Jeronimus failed to complete properly a PCOC report. In her December, 2001 performance evaluation of Jeronimus, though, Tucker again indicated that

3

Jeronimus met or exceeded expectations in all categories; however, she also noted "[n]ot enough staff supervision. . . . [d]oes not get reports completed in a timely manner . . . [a]ttend required meetings on time [or] . . . [k]eep his staff informed."

On December 7, 2001, Tucker sent Jeronimus a memo, outlining five concerns which needed to be discussed. Specifically, Tucker noted: (1) that financial reports were consistently prepared late; (2) that Jeronimus was consistently late for meetings; (3) that monthly departmental meetings were not being held despite Tucker's request; (4) that Jeronimus's staff felt that important decisions were being improperly delegated from him to them; and (5) that Jeronimus reportedly had been borrowing money from staff members.

## 2. Written Warnings

On January 2, 2002, Tucker sent Jeronimus a warning letter. In that letter, Tucker noted that Jeronimus turned in a report to a PCOC auditor with incorrect figures, blamed the error on a subordinate, and left the auditor alone in the building without informing the auditor that he was leaving for the day. In addition, Tucker noted a specific instance in which Jeronimus was not following the Head Start administrative accounting guidelines properly. Tucker concluded by adding that "incorrect figures and bad audits could cost this agency grant funds and I do not plan to let that happen. If this should occur again, you leave me no alternative but

4

to place you on suspension without compensation."

On May 13, 2002, Tucker sent a Jeronimus written warning expressing her concerns about his general preparedness. Tucker noted that Jeronimus had failed to come prepared to a meeting with a PCOC auditor. In addition, Tucker indicated that he had been untimely in submitting reports to the PCOC Finance Committee, Policy Council, and Board of Directors. Tucker concluded by adding, "I will not allow you to put this agency at risk by your lack of preparation. This is your second warning. If you do not have a satisfactory explanation, you will be placed on three (3) day suspension."

### 3. Financial Mismanagement

To ameliorate a cash flow problems in the CSBG program, Jeronimus improperly let the CSBG account borrow from the Head Start account.[2] In addition, he floated checks from the Head Start account while there were insufficient funds to make payment. On July 24, 2002, Tucker received notice from the bank that a PCOC check in the amount of $16,489.00 had been returned for insufficient funds. The following day, Tucker sent a written warning to Jeronimus indicating that deliberately issuing bad checks is not acceptable and

---

[2]The CSBG program uses a different budget than the Head Start program. CSBG funds are provided by the federal government but dispersed through the Florida Department of Community Affairs ("FDCA").

5

noting that Jeronimus had "neglected to inform [Tucker] that [he was] mailing out checks with insufficient funds." In addition, Tucker noted that Jeronimus was not keeping in touch with staff and ordered him to have weekly staff meetings. Tucker concluded by adding that "this is the second warning that I have had to issue to you. The next step is a five-day suspension without pay."

The following day, July 26, Jeronimus sent an email to Tucker and Donna Etzel, PCOC's human resources director, complaining that he was being "unjustly singled out for circumstances beyond [his] control," that Tucker "was conducting a campaign of harassment," and adding that "[t]his is a truly hostile environment. . ." After sending it, Jeronimus reconsidered because the email contained harsh language. He then went downstairs to Etzel's office, and asked that she delete it, which she did.

Tucker promptly launched an investigation into the practices within the finance department. Tucker discovered that in the months of May through July 2002, Jeronimus had, without notifying Tucker, issued 47 checks – totaling more than $50,000 – with insufficient funds, creating overdrafts in PCOC's account.[3] On July 31, 2002, Jeronimus met with Tucker and informed her that, in addition to floating checks, he had been using Head Start funds to address PCOC's cash flow

---

[3]Reviewing the August, 2002 bank statement, Tucker discovered that Jeronimus had issued an additional 24 checks without sufficient funds.

problems. Tucker then sent Jeronimus a letter informing him that Head Start funds may not be used to fund other programs,[4] that PCOC's auditor would be on site to see whether there were problems with how Head Start had been administered, and that he would be suspended without pay during the pendency of the investigation.

The auditors produced a written report on August 6, 2002. In it, they found that for the period of May through July 2002, there were three instances in which Head Start funds had been improperly used for purposes not related to Head Start. Over that same period, the auditors found 72 instances (in an amount of $88,953.85 plus $1,334.00 in overdraft fees) of checks being drawn without sufficient funds to cover them.

## B. Jeronimus's Termination

By letter dated August 13, 2002, Tucker informed Jeronimus that the auditors had reviewed the agency records, and that he was being terminated based on the information they had discovered. After his termination, Jeronimus wrote an email, which he sent to the white members of the PCOC Board, complaining of his termination. His email explained how he was not responsible for the underlying cash flow crisis which precipitated his termination. Following Jeronimus's termination, the vacant Director of Finance position was advertised in a local

---

[4]Borrowing from Head Start funds to meet other financial obligations is forbidden by regulation.

7

newspaper and filled by Craig Fetherman, a white male.

## C.    Allegations of Differential Treatment

As discussed later, Jeronimus contends that Tucker supervised and treated Gail Wiggs ("Wiggs"), the PCOC Head Start Director, and Lela Wooten ("Wooten"), a Senior Program Resource Coordinator, more favorably because they are black and female.[5]  Thus, we review the facts regarding Wiggs and Wooten.

As Head Start Director, Wiggs was responsible for having additional children enrolled in the Head Start program.  Head Start sent a letter to PCOC indicating that funding was available to expand enrollment by an additional 68 children.  Wiggs was responsible for getting additional children enrolled and Jeronimus was responsible for implementing the financial aspects of the expansion.  Although Jeronimus completed his duties with respect to the expansion, Wiggs did not.  Jeronimus reported Wiggs's failure to the PCOC Board of Directors every month for eight months.  In addition, Tucker visited some of the sites and had

---

[5]Jeronimus also suggests that there was an environment of racial discriminatory animus at PCOC. Jeronimus notes two statements by Tucker (his superior), and two statements by Wooten (a colleague).  During a meeting with an insurance carrier, Tucker asked the rhetorical question, "why is it that the good guys wear white and the bad guys wear black?"

A second incident coincided with a training that Jeronimus was giving, in which Tucker told Jeronimus that he "better be training the black people in this room too or it's not – it's going to look like you're only taking care of the nonblacks."  After two presentations given by white males who worked for outside vendors, Jeronimus heard Wooten say "white boy" with a smirk on her face, which Jeronimus took to mean "What does he know?  He's a white boy."  After the second presentation, Jeronimus mentioned the "white boy" comment in passing to Etzel because he thought it was "odd."

concerns that some of the children might not be prepared for kindergarten. For these reasons, in the fall of 2002, Tucker urged Wiggs to step down as Head Start Director. Wiggs stepped down and took the position of Assistant Head Start Director.

Gail Wooten ("Wooten") was responsible for, among other things, preparing grant applications to secure funding for the CSBG program. On February 23, 2001, Hilda Frazier, FDCA Planning Manager, wrote to PCOC and stated that FDCA could pay 100% of the contract allocation and incorporate any carryover from the previous fiscal year into the next contract. The funding, however, would not be released until appropriate modification documentation was submitted by PCOC and approved by the FDCA. The following year, on March 27, 2002, PCOC received a letter from FDCA indicating that the modification documentation had not been received and that the documentation must be submitted "as soon as possible to avoid delays in processing [PCOC's] request for payment." The modification documentation was submitted on May 6, 2002, and the FDCA funds did not become available until the end of June, 2002. According to Jeronimus, the delays in receiving FDCA funds caused a cash shortage in the CSBG program. Jeronimus also notes that by failing to satisfy several conditions of a Teen Outreach grant award, Wooten caused PCOC to incur a ten percent monthly

9

holdback penalty, resulting in a total loss of $5,000 to PCOC.

## D. Proceedings Before the District Court

On August 12, 2003, Jeronimus filed the instant complaint alleging race and sex discrimination and retaliation by PCOC and Tucker in violation of Title VII, the FCRA, and 42 U.S.C. § 1981. The defendants moved for summary judgment, which the district court granted on January 11, 2005.[6]

The district court concluded that Jeronimus did not establish a prima facie case of race or sex discrimination because he failed to show that any similarly-situated employees outside his protected class were treated more favorably than he was. Even if Jeronimus had established a prima facie case, the district court concluded that his claim nonetheless failed because the undisputed facts demonstrated that he had been terminated for legitimate, nondiscriminatory, nonpretextual reasons. The district court also concluded that Jeronimus's retaliation claim failed because he had not engaged in protected activity, and that in any event, he did not show a causal connection between the ostensibly protected activity and his termination. Jeronimus timely appeals.

---

[6]This Court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. Harris v. H & W Contracting Co., 102 F.3d 516, 518 (11th Cir. 1996). "Summary judgment is appropriate if the record shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (11th Cir. 1998) (quotation marks and citation omitted).

## II. DISCUSSION

## A.     The Discrimination Claims

Title VII provides that:

It shall be an unlawful employment practice for an employer. . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of race or sex discrimination by circumstantial evidence,[7] a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class, or was treated less favorably than a similarly situated person outside the protected class. Maynard v. Bd. of Regents of the Univs. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). A similarly situated person is one that has engaged in similar misconduct. Anderson v. WBMG-42, 253 F.3d 561, 564 (11th Cir. 2001).

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory business reason for the employment action at issue. Silvera v. Orange County Sch. Bd., 244 F.3d

_____

[7]Jeronimus concedes that he is not making a claim of discrimination or retaliation on the basis of direct evidence.

11

1253, 1258 (11th Cir. 2001). If the defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate why the proffered reason is a pretext for race or sex discrimination. Id. To prove that a legitimate, nondiscriminatory reason for the adverse employment action is a pretext for race or sex discrimination, a plaintiff must show either "that a discriminatory reason more likely motivated the employer or. . . that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095 (1981); see also Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996). Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets, 196 F.3d 1354, 1361 (11th Cir. 1999).

We first agree with the district court that Wiggs and Wooten were not similarly situated to Jeronimus because their performance issues were not as serious as Jeronimus's performance issues. Wiggs and Wooten, like Jeronimus, reported to Tucker. Wiggs's conduct involved (1) a delay in expanding the Head Start program to enroll an additional sixty-eight children and (2) operation of some sites in a manner that, in the eyes of Tucker, may have been insufficient to prepare

12

the children-beneficiaries for kindergarten. Wooten's conduct involved (1) a delay in submitting modification documentation to the FDCA in a manner that would enable the CSBG program to have sufficient funds timely and (2) incurring a cost of $5,000 to PCOC in the Teen Outreach Grant.

Jeronimus's conduct was substantially different and more serious than the conduct of either Wiggs or Wooten. From early in his employment, Tucker expressed concerns that Jeronimus was unable or unwilling to get along with coworkers, that his management was too hands-off, that his reports were consistently not being prepared in a timely manner, and that he was not competently managing PCOC's finances. These concerns were memorialized in numerous letters and memoranda from Tucker to Jeronimus and in strong and unequivocal language. Ultimately, what led to his termination was the discovery that Jeronimus was violating agency regulations by inappropriately using Head Start funds for other underfunded programs and diminishing PCOC's standing with creditors by floating checks without sufficient funds. Because Jeronimus's conduct was substantially different and more serious than the conduct of Wiggs or Wooten, they cannot be said to have engaged in similar conduct.[8] Accordingly, the

_____

[8]Jeronimus also compares the treatment he received to that of Charlotta Saab, a black female, former assistant director at PCOC whom Tucker terminated. Jeronimus contends that he was treated differently because Saab was terminated only after face-to-face counseling and because she was permitted to appeal to the PCOC Board of Directors while he was permitted to

13

district court did not err in concluding that Jeronimus failed to establish a prima facie case of race or sex discrimination and in entering summary judgment in favor of the defendants on his discrimination claims.[9]

Jeronimus also contends that his treatment compared to that of black female employees, combined with the comments that Tucker and Wooten made, show that the reasons for his termination were pretextual.[10]  Because Jeronimus has failed to establish a prima facie case of discrimination, there is no need to reach the issue of prextext.  However, the district court did address pretext, and it is clear that given Jeronimus's admission that the performance-related issues Tucker addressed in her correspondence to him were legitimate concerns, he cannot show that there reasons for his termination were pretextual in any event.

**B.    The Retaliation Claims**

---

appeal to a personnel committee.  We find no merit in this contention.  Both employees were terminated, and neither were reinstated through the appeal procedure.

[9]Because the FCRA is patterned after Title VII, the district court also properly entered summary judgment on Jeronimus's FCRA claims.  See Harper v. Blockbuster Entertain. Corp., 139 F.3d 1385, 1387 (11th Cir. 1998).  Additionally, because Title VII and § 1981 "have the same requirements of proof and use the same analytical framework," Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998), the district court properly entered summary judgment on Jeronimus's race discrimination claim under § 1981.  Although the district court did not specifically mention § 1981, because the § 1981 claim is reviewed under the same framework as Title VII, any error which might exist in the failure to reference § 1981 is harmless.

[10]Although Wooten was not a decisionmaker in the decision to terminate Jeronimus, her remarks, "may provide circumstantial evidence to support an inference of discrimination."  Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291-92 (11th Cir. 1998).

14

Title VII provides that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees. . . because [the employee] has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1117 (11th Cir. 2001) (citation omitted). The only actions which could conceivably qualify as protected activity were Jeronimus's casual mention to Etzel of Wooten's "white boy" comment and the email that he sent to Etzel complaining that he was being unjustly singled out. All indications, including Jeronimus's contemporaneous reaction, are that the "white boy" comments were isolated, ephemeral, and ambiguous. And in the email, while Jeronimus complained of being "singled out," being subjected to "a campaign of harassment," and working in a "hostile environment," he never suggested that this treatment was in any way related to his race or sex. Even assuming that Etzel had the opportunity to read the entire email before she deleted it, this email did not amount to protected conduct. And even if the email did qualify as protected conduct, we agree with the

15

district court that Jeronimus made no showing of a causal connection between the email (or the comment in passing to Etzel) and his termination.

### III. CONCLUSION

For all of the above reasons, this Court affirms the district court's entry of summary judgment in favor of the defendants on all of Jeronimus's claims.

**AFFIRMED**.